IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. CR-05-168-L |
| | ) | |
| ERIC S. HSIUNG, ERIC CHEN, | ) | |
| RICHARD YOUNG KIM, and | ) | |
| TUYEN VU NGO, | ) | |
| | ) | |
| Defendants. | ) | |

# O R D E R

On September 20, 2005, a federal grand jury returned a two-count indictment
against defendants charging them with conspiracy to possess with intent to distribute
methylenedioxymethamphetamine ("MDMA") and possession of MDMA with intent
to distribute.  This matter is before the court on various motions presented by
defendants.  On January 5, 2006, the court held an evidentiary hearing on
defendants' motions to suppress.[1]  In addition, the parties presented argument and
evidence to enable the court to determine the admissibility of co-conspirator
statements pursuant to the procedure enunciated in United States v. James, 590
F.2d 575, 589 (5th Cir.), cert. denied, 442 U.S. 917 (1979).  Finally, the court heard
argument regarding Tuyen Vu Ngo's Motion to Sever from the Other Defendants.

---

[1]On December 29, 2005, defendant Eric S. Hsiung filed a motion to withdraw his motion to
suppress, which the court granted.  Hsiung's motion is nonetheless relevant because defendants
Kim and Ngo filed motions to adopt motions filed by other defendants.

Background

Based on the parties' briefs and the evidence presented at the hearing, the court finds that on August 25, 2005, at approximately 10:00 a.m., Oklahoma Bureau of Narcotics ("OBN") Agent Troy Wall observed a Lincoln Navigator and a Honda Accord with California license plates traveling east on Interstate 40.  Wall has been patrolling Oklahoma highways as an interdiction officer since April 2004.  He has had more than 300 hours of specialized training and has made more than 40 stops where a large amount of drugs was discovered.  Based on his training and experience, Wall believed the Navigator and Honda were traveling together.  As Wall approached the vehicles in the passing lane, he noticed that the Honda was following too close to the Navigator.  When Wall passed the vehicles in his marked OBN car, he noticed the drivers and passengers in both vehicles stared straight ahead and both drivers appeared nervous.  The driver of the Honda did not back off from the Navigator, which Wall found to be unusual.  In his experience, drivers attempt to correct traffic violations when they see a marked police vehicle.  Wall suspected the vehicles might be involved in criminal activity and that the Honda was being used as a decoy car.  Based on his training, Wall knew that drug smugglers often used two vehicles, with the driver of the decoy or escort car committing traffic violations in an attempt to distract law enforcement from the car carrying the contraband.

Even when Wall activated his rear emergency lights, the Honda did not move back from the Navigator.  After Wall forced his way between the two vehicles, he noticed that the bottom portion of the Navigator license tag was obscured by a license plate frame.  As Wall could not clearly discern the tag number, he activated his front emergency lights in order to stop the Navigator.  After Wall activated his front lights, the Honda made an unsafe lane change, caught up with the Navigator, and then continued on.   Wall stopped the Navigator at 10:09 a.m.   *See* Government's Exhibit 4.

Wall testified he stopped the Navigator for two reasons: (1) he believed its license plate was obscured by a tag frame in violation of 47 O.S. § 1113(A)(2) and (2) he was suspicious that the occupants were engaged in criminal activity, specifically drug smuggling.  When Wall approached the Navigator, he noticed the odor of burnt marijuana.  Defendant Eric Hsiung, who was driving the vehicle, was unable to produce a driver's license.  Hsiung told Wall that his license was in the Honda Accord, thus confirming Wall's suspicion that the vehicles were traveling together.  Hsiung was extremely nervous and remained so even after Wall told him he was only going to issue a warning for the license plate violation.  Hsiung and his passenger, defendant Eric Chen, gave conflicting stories regarding their travel plans. Hsiung first indicated that the four men were traveling from California to Oklahoma City to drop off the Honda and then all four were returning to California in the Navigator; Hsiung later added that they were going to Illinois after stopping in

-3-

Oklahoma City.  In contrast, Chen told Wall that the men were traveling to Oklahoma City to visit Richard Kim's uncle and were then traveling back to California in both cars.  Chen specifically denied that they were traveling anywhere else.  Hsiung and Chen also contradicted each other regarding ownership of the Navigator.  Hsiung first told Wall that Chen was the owner of the car; when asked again, Hsiung stated that Chen's uncle or step-father owned the car.  Chen, however, not only denied owning the vehicle, but also stated he did not know who owned it.  After fellow OBN Special Agent Ronnie Jackson notified Wall that the Honda Accord was returning to the eastbound lanes, Wall asked Jackson to stop the Accord to compare notes. Jackson initiated the stop of the Honda at approximately 10:20 a.m.  At 10:28 a.m., Jackson informed Wall that the driver and passenger in the Honda denied traveling with the Navigator and said they were going to a wedding in Dallas, Texas.

        Based on the discrepancies in the defendants' stories, the fact that the Honda and Navigator were obviously traveling together, and the smell of marijuana emanating from the Navigator, Wall decided to search the car.  Before doing so, he asked Hsiung what, if anything, belonged to him; Hsiung replied he and Chen each had one duffle bag and the other bags belonged to Richard Kim's uncle who now lived in Oklahoma City.  Hsiung indicated those bags contained "supposedly" just clothes.  Id.  In contrast, Chen stated that all the bags in the car belonged to him and Hsiung.  Wall began the search at 10:29:10 a.m.  At 10:30 a.m., Wall opened a duffle bag in the cargo compartment; the bag contained pills that later tested positive

for MDMA.  Wall immediately placed Chen and Hsiung under arrest.  As Hsiung was being handcuffed, he asked, "What is it, X?"  X is a common street name for MDMA or ecstacy.

Jackson testified he stopped the Honda because it was impeding the flow of traffic in the left lane.  Jackson conceded that he would have stopped the vehicle even without observing a traffic violation because Wall had requested that he do so.  At 10:28 a.m., Jackson began writing a warning citation for the driver, defendant Richard Kim.  Government's Exhibit 5.  Jackson requested driver's license and warrant information for Kim and his passenger, Tuyen Vu Ngo, at 10:28:54 a.m.  At 10:37 a.m., dispatch informed Jackson that Kim and Ngo's licenses were valid and neither had any outstanding warrants.  Id.  Neither Kim nor Ngo owned the Honda and Kim was unable to tell Jackson the owner's name or where he lived.

At 10:35 a.m., OBN Agent William Diaz's certified canine alerted on the Honda, indicating the presence of narcotics.  At 10:40 a.m., Kim and Ngo were handcuffed and placed in Jackson's car.  Jackson and Diaz then drove the Honda and the patrol car to Wall's location approximately one quarter mile east.  During the search of the two vehicles, officers found matching walkie-talkies in each car, both of which were tuned to the same frequency.  At 10:44 a.m., the recorder in Jackson's vehicle captured a conversation between Kim and Ngo.  Kim exclaimed that the officers had found the walkie-talkies and that was "not good".  Id.  Kim also said that they should have kept going and that coming back was a mistake.  Id.

Motions to Suppress

In their motions to suppress, defendants challenge the initial traffic stops of the two cars.  "[A] traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring." United States v. Botero-Ospina, 71 F.3d 783, 787 (10th Cir. 1995), *cert. denied*, 518 U.S. 1007 (1996).  Likewise a traffic stop can be initiated "if the officer's action is supported by reasonable suspicion to believe that criminal activity '"may be afoot."'" United States v. Arvizu, 534 U.S. 266, 273 (2002) (citations omitted).

> The Supreme Court has emphasized that, in determining whether an investigatory stop is supported by reasonable suspicion, courts must "'look at the totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing."  The evaluation is made from the perspective of the reasonable *officer*, not the reasonable *person*.  Officers must be permitted "to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'"

United States v. Quintana-Garcia, 343 F.3d 1266, 1270 (10th Cir. 2003) (citations omitted) (emphasis in original).

The first reason articulated by Wall for stopping the Navigator was his belief that the tag frame was unlawful under Oklahoma law.  Section 1113(A)(2) of Title 47 of the Oklahoma Statutes provides:

> The license plate shall be securely attached to the rear of the vehicle . . . .   The license plate, decal and all letters and numbers shall be clearly visible at all times.   The operation of a vehicle in this state, regardless of where such vehicle is registered, upon which the license plate is covered, overlaid or otherwise screened with any material, whether such material be clear, translucent, tinted or opaque, shall be a violation of this paragraph.

47 O.S. § 1113(A)(2).   The parties agree there are no Oklahoma cases construing this section and that "a reasonable interpretation of the statute is that it criminalizes obstructions of license plates which interfere with the readability and/or visibility of the plate."[2]   Based on the evidence presented at the hearing, the court finds Wall had a reasonable articulable suspicion that the Navigator's tag violated Oklahoma's tag visibility requirements.   An examination of Government's Exhibit 1 reflects the tag is not clearly visible within the meaning of the statute as the bottom portions of the letter "J" and the number "7" are covered; the "J" could thus be a "1" and the "7" could be the letter "Z".   Nonetheless, the test is not whether the court can clearly read the tag based on a static photograph, but whether a reasonable officer in Wall's position – that is traveling at 70 miles per hours on a highway – could believe that a violation of Oklahoma statutes was occurring.   The court finds that he could.   The stop of the Navigator on this basis was warranted.

---

[2]Government's Response to Defendant Eric S. Hsiung's Motion to Suppress, Defendant Eric Chen's Motion to Suppress Evidence and Statements, Defendant Richard Young Kim's Motion to Suppress, and Defendant Tuyen Vu Ngo's Motion to Suppress at 12.

Likewise the court finds, based on the totality of the circumstances, it was reasonable for Wall to suspect the Navigator and the Honda were involved in criminal activity.  Based on his training and experience, Wall suspected the two cars were traveling together, with the Honda acting as the decoy car.  Both cars had California plates, and Wall knew California was a source of narcotics.  The Honda's failure to correct its traffic violation, coupled with the drivers' and passengers' failure to acknowledge the marked police car when it passed, further aroused Wall's suspicions.  The Honda's unsafe lane change after Wall placed his vehicle between the Navigator and the Honda caused Wall to believe the Honda was trying to distract his attention from the Navigator, which is a technique used by drug traffickers. Based on the totality of the circumstances, Wall was justified in stopping the Navigator.  After the stop of the Navigator, Wall's suspicion of criminal activity was heightened by the inconsistent statements about travel plans and ownership of the vehicle offered by Hsiung and Chen, the smell of marijuana, Hsiung's and Chen's extreme nervousness, and the fact that neither Hsiung or Chen could provide proof of their authority to operate the vehicle, which was owned by a third party.  *See* United States v. Williams, 271 F.3d 1262, 1268-69 (10th Cir. 2001), *cert. denied*, 535 U.S. 1019 (2002); United States v. Hunnicutt, 135 F.3d 1345, 1349 (10th Cir. 1998).

This justification – coupled with the traffic violations observed by Wall – also supported stopping the Honda, particularly after Hsiung and Chen confirmed that the Honda was traveling with them.  Defendants' reliance on United States v. Martinez-

Cigarroa, 44 F.3d 908 (10th Cir. 1995), is misplaced.  In Martinez-Cigarroa, there

was no basis for believing that the two vehicles at issue were connected.  *See* id. at

910.  In contrast, in this case, both Hsiung and Chen admitted that the Honda was

traveling with them.  It was after these conversations that Wall advised Jackson to

stop the Honda, which Jackson did approximately four minutes later.   Wall's

reasonable suspicion that the Honda was involved in criminal activity is imputable

to Jackson.

> It is well-established that when an order to stop . . . a
> suspect is communicated to officers in the field, the
> underlying facts constituting . . . reasonable suspicion
> need not be communicated, so long as the individual or
> agency issuing the order can justify the intrusion on Fourth
> Amendment rights.

United States v. Shareef, 100 F.3d 1491, 1503 n. 4 (10th Cir. 1996).  Furthermore,

based on Wall's request, it was reasonable for Jackson to stop the Honda "to check

identification, to pose questions to the person, or to detain the person briefly while

attempting to obtain further information."   United States v. Hensley, 469 U.S. 221,

232 (1985) (citations omitted).  The length of Jackson's detention of Kim and Ngo

was also reasonable as neither defendant had produced proof of their entitlement

to operate the Honda and Jackson had not received license-check and warrant

information prior to the time Wall discovered the contraband in the Navigator.  Based

on the totality of the circumstances, the court finds the initial stop of both vehicles

was justified.

Because the court has found the initial stop justified, defendants' argument that the subsequent search and statements obtained must be suppressed as fruit of the poisonous tree fail.  Moreover the court finds defendants lack standing to question the validity of the search of the vehicles.[3]

> Whether a defendant has standing to challenge a search under the Fourth Amendment is a question of law . . . . "A defendant may not challenge an allegedly unlawful search or seizure unless he demonstrates that his own constitutional rights have been violated."  Standing to lodge such a challenge depends upon two factors: (1) whether one demonstrated by his conduct a subjective expectation of privacy, and (2) whether society is prepared to recognize that expectation as reasonable.

United States v. Conway, 73 F.3d 975, 979 (10th Cir. 1995) (citations omitted). None of the defendants owned either vehicle, nor could they provide proof of their authority to operate the vehicles.  The Court of Appeals for the Tenth Circuit has consistently held that "a defendant in sole possession and control of a car rented by a third party has no standing to challenge a search or seizure of the car."  United States v. Jones, 44 F.3d 860, 871 (10th Cir. 1995).  Moreover, the search of both vehicles was supported by probable cause.  If an officer smells marijuana in the passenger compartment of a vehicle, he has probable cause to search all areas open to the passengers, including the luggage compartment of a sport utility

---

[3]Defendants do have standing to seek suppression of evidence obtained as the fruit of an unlawful stop.  See United States v. Eylicio-Montoya, 70 F.3d 1158, 1162 (10th Cir. 1995).

vehicle.[4]   *See* United States v. Nielsen, 9 F.3d 1487, 1491 (10th Cir. 1993).  The canine alert on the Honda provided probable cause to search it.  United States v. Rosborough, 366 F.3d 1145, 1153 (10th Cir. 2004).  The court thus denies defendants' motions to suppress evidence obtained from the stop and search of the vehicles and defendants' detention.


## James Hearing

At trial, the government intends to offer numerous statements made by the defendants prior to and during the stop.  Before the court can admit statements of an alleged co-conspirator, it must find by a "preponderance of the evidence:  (1) that a conspiracy existed; (2) that the declarant and the defendant were both members of the conspiracy; and (3) that the statements were made in the course of and in furtherance of the conspiracy."  United States v. Sinclair, 109 F.3d 1527, 1533 (10th Cir. 1997) (citations omitted).  Before making this determination, the court must hold a hearing outside the presence of the jury to determine first whether the government has established the existence of a conspiracy.  In determining whether a conspiracy exists, the court may consider the statements themselves.  United States v. Gonzalez-Montoya, 161 F.3d 643, 649 (10th Cir. 1998), *cert. denied*, 526 U.S. 1033 (1999).

---

[4]Although the smell of burnt marijuana, standing alone, would not have given Wall probable cause to search the trunk of a vehicle, the Navigator did not have a trunk.

In addition to the statements noted in the government's Memorandum Outlining Statements to be Presented at the January 5, 2005 *James* Hearing, the evidence presented at the hearing provides sufficient indicia that a conspiracy to transport drugs existed.  The two vehicles were clearly traveling together, as evidenced not only by Hsiung and Chen's admissions, but also by the fact that Hsiung's driver's license was in the Honda and Kim's passport was found in the Navigator.  The matching walkie-talkies, both tuned to the same frequency, are evidence defendants were communicating with each other while they were traveling. Finally, the court can consider the fact that illegal drugs were in fact found in the Navigator.  The court finds the evidence is also sufficient to establish that all four defendants were members of the conspiracy.  Based on Kim's statement to Hsiung that they were "short one driver", it can be inferred that the other three people involved in the trip at issue were part of the usual crew of drivers.  Furthermore, Chen and Kim both admitted to Hsiung that they participated in such "trips". Although Ngo was never mentioned by name before defendants began the trip, the fact that he was left alone with the contraband at a hotel room in Flagstaff, Arizona indicates that he was trusted by Kim and Chen.

The court rejects defendants' assertion that it cannot admit statements made in "early August 2005" because the indictment alleges a conspiracy "[f]rom on or about August 24, 2005, to on or about August 25, 2005".[5]  As the statements in

_____

[5]Indictment at 1 (issued Sept. 20, 2005) (Doc. No. 53).

question occurred only a few weeks prior to the dates alleged in the indictment, they are admissible as evidence of the conspiracy.  *See* United States v. Charley, 189 F.3d 1251, 1272-73 (10th Cir. 1999), *cert. denied*, 528 U.S. 1098 (2000).  Moreover, the statements in question are admissible pursuant to Fed. R. Evid. 801(d)(2)(A). The court also rejects Chen's argument that his confrontation clause rights were violated because Hsiung did not testify at the *James* hearing.  With respect to that argument, the Court of Appeals for the Tenth Circuit recently noted:

> In addition, Arriola-Perez's appellate counsel asserted at oral argument that the Supreme Court's holding in the case of *Crawford v. Washington*, . . . trumps the Fed. R. Evid. 801(d)(2)(E) hearsay exclusion.  *Crawford* held that the Sixth Amendment bars out-of-court statements by witnesses that are *testimonial* in nature unless the witnesses are unavailable and the defendant had a prior opportunity for cross-examination.  Here, however, we are considering out-of-court statements made in furtherance of a conspiracy, which have historically been considered *nontestimonial* . . . because "co-conspirator statements simply cannot be replicated, even if the declarant testifies to the same matters in court.  Because the statements are while the declarant and the accused are partners in an illegal enterprise, the statements are unlikely to be false and their admission actually furthers the Confrontation Clause's very mission which is to advance the accuracy of the truth determining process in criminal trials."

United States v. Arriola-Perez, 137 Fed. Appx. 119, 130 n.8 (10th Cir. 2005), *cert. denied*, 2006 WL 37190 (Jan. 9, 2006) (citations omitted).  The court therefore concludes the statements outlined in the government's memorandum will be admissible at trial.

<u>Motion to Sever</u>

Defendant Tuyen Vu Ngo seeks a separate trial pursuant to Fed. R. Crim. P. 14.

> "In deciding on a motion for severance, the district court has a duty to weigh the prejudice resulting from a joint trial of co-defendants against the expense and inconvenience of separate trials."  The preference in a conspiracy trial is that persons charged together should be tried together. To establish an abuse of discretion, a defendant must make a strong showing of actual prejudice. . . .  "[A] complaint of the 'spillover effect' from the evidence that was overwhelming or more damaging against the co-defendant than that against the moving party is [not] sufficient to warrant severance."   Rather, to show prejudice a defendant must show that "there is a serious risk that a joint trial would compromise a specific trial right, or prevent the jury from making a reliable judgment about guilt or innocence."

<u>United States v. Small</u>, 423 F.3d 1164, 1181-82 (10th Cir. 2005) (citations omitted).

Based on this standard, the court denies Ngo's motion to sever.  Ngo has failed to establish sufficient prejudice to warrant severance.


<u>Conclusion</u>

In sum, defendants' motions to suppress (Doc. Nos. 85, 96, and 101) are DENIED.  Defendant Kim's Motion for Production of Statements Alleged to be Admissible Under the Co-Conspirator Exception to the Hearsay Rule (Doc. No. 82)

is DENIED.  Defendant Ngo's Motion to Sever from the Other Defendants (Doc. No

97) is DENIED.

It is so ordered this 13th day of January, 2006.

TIM LEONARD
United States District Judge